# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Blue Motorola<br>50 MP QMAD Pixel<br>(Seizure No. N-4) | )<br>)<br>)  Case No.  **23MJ3215-AHG**<br>)<br>)<br>) |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2 incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 841, 846 | Distribution and Conspiracy To Distribute Controlled Substances |
| 21 USC Sec. 952, 960, 963 | Importation and Conspiracy to Import Controlled Substances |

The application is based on these facts:

See Attached Affidavit of DEA Special Agent Miguel Garrido, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Miguel Garrido*
Applicant's signature

Miguel Garrido, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: August 25, 2023

*Allison H. Goddard*
Judge's signature

City and state: San Diego, California       Honorable Allison H. Goddard, United States Magistrate Judge
*Printed name and title*

# ATTACHMENT A-2
PROPERTY TO BE SEARCHED

The following property is to be searched:

Blue Motorola 50 MP QMAD Pixel (Seizure No. N-4) ("**Target Device 2**")

The **Target Device** is currently in the possession of the Drug Enforcement Administration at the DEA San Ysidro Division Office located at 2055 Sanyo Ave, San Diego, California.

1

# ATTACHMENT B-2
ITEMS TO BE SEIZED

Authorization to search the **Target Device** described in Attachment A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the device for evidence described below. The seizure and search of the device shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the device will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, beginning on **November 8, 2022, up to and including August 3, 2023**.

a. tending to indicate efforts to deliver controlled substances from Mexico to the United States, or to sell or distribute controlled substances in the United States;

b. tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, phone numbers – that may contain electronic evidence regarding efforts to deliver controlled substances from Mexico to the United States to traffic, sell, or distribute controlled substances in the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to deliver controlled substances from Mexico to the United States or to traffic, sell or distribute controlled substances in the United States;

d. tending to identify travel to or presence at locations involved in efforts to deliver controlled substance from Mexico to the United States, or to traffic, sell or distribute controlled substances in the United States;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963.

2

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS

I, Miguel Garrido, Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, hereby state as follows:

### INTRODUCTION

1. I submit this affidavit in support of an application for warrants to search the following electronic devices:

    1) Green Samsung IMEI: 35349966494677 (Seizure No. N-3) ("**Target Device 1**");
    2) Blue Motorola 50 MP QMAD Pixel (Seizure No. N-4) ("**Target Device 2**");
    3) Silver iPhone 12 Pro Max IMEI: 355591191893722 (Seizure No. N-5) ("**Target Device 3**");
    4) Blue iPhone 12 Pro IMEI: 359330183512092 (Seizure No. N-8) ("**Target Device 4**"); and
    5) Purple Motorola AI Dual Camera (Seizure No. N-9) ("**Target Device 5**"),

(collectively, the "**Target Devices**"), as further described in Attachments A-1 through A-5, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841, 846. 952, 960, and 963, as further described in Attachments B-1 through B-5. The requested warrants relate to the investigation and prosecution of Monica HEREDIA LOPEZ ("HEREDIA") and Abraham NAVARRETE ("NAVARRETE") for conspiracy to possess with intent to distribute approximately 39.8 kilograms of cocaine. The **Target Devices** are currently being held at the DEA San Ysidro Division Office located at 2055 Sanyo Ave, San Diego, California.

2. The information contained in this affidavit is based on my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining search warrants for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

1

## TRAINING AND EXPERIENCE

3.  I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am a Special Agent (SA) with the United States Drug Enforcement Administration (DEA) charged with enforcing Title 21 of the United States Code, the Controlled Substances Act. I am empowered and required by law to conduct investigations and make arrests under 21 U.S.C. § 878.

4.  I am currently assigned to DEA Group 71, at the San Ysidro District Office (SYDO). I have been employed with the DEA since June 2022. My duties include the investigation and apprehension of individuals involved in drug trafficking and related activities. I have received formal training at the DEA Training Academy in Quantico, Virginia. My training included the identification of many types of controlled substances by sight and odor.

5.  Prior to my work with the DEA, I was a Chicago Police Officer for five years, in which my last year of service I was assigned to the narcotics unit. As a Chicago Police Narcotics Officer, I was responsible for enforcing state laws regarding illegal sales of narcotics and possession. During my time with the Chicago Police Department, I have received formal training in the identification of narcotics and techniques used by traffickers and narcotics street sales.

6.  During my employment with DEA, I have investigated and participated in the investigation of illicit controlled substance trafficking, including the distribution of cocaine and other controlled substances within the United States and the importation of narcotics from Mexico to the United States. I have participated in multiple investigations for controlled substance violations, and during these investigations, I have used a variety of investigative techniques and resources, including physical and electronic surveillance, undercover and confidential source buy operations, search and tracking warrants, and the analysis of telephone records. Further, I have participated in investigations in which drug traffickers relied heavily

upon telephone communication and other electronic devices as a means of communicating. In addition, I have been trained in interviewing individuals who have been directly and indirectly involved in the importation, transportation, distribution and manufacturing of illegal drugs and controlled substances.

7. Based on my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods utilized in narcotics trafficking operations and some of the unique trafficking patterns employed by narcotics organizations. I know that drug traffickers often require the use of a telephone facility to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. I know that professional drug operations depend upon maintaining their extensive contacts. The telephone enables drug traffickers to maintain contact with associates, suppliers and customers. I also know that drug traffickers sometimes use fraudulent information, such as fictitious names and false addresses, to subscribe to communication facilities, especially cellular phones. Through these investigations, my training and experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics. I am also familiar with the methods employed by large-scale narcotics organizations in attempts to thwart detection by law enforcement including but not limited to the use of cellular telephone technology, counter surveillance techniques, false or fictitious identities and addresses, and coded communications. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including their methods of distribution, storage, and transportation of narcotics, their methods of collecting proceeds of narcotics trafficking, and their methods of laundering money to conceal the nature of the proceeds. Based on my training and experience, I know that drug trafficking at the retail level is largely a cash business.  I know that drug traffickers often generate large amounts of unexplained wealth,

and through financial transaction, attempt to conceal, disguise or legitimize unlawful proceeds, through domestic and international banks and their attendant services, and otherwise legitimate businesses which generate large quantities of currency. In addition, drug traffickers often use drug proceeds to purchase additional narcotics to perpetuate and promote the ongoing conspiracy. I know that drug traffickers often use cellphones to communicate with co-conspirators in furtherance of their money laundering activities. During the course of my employment, I have also become familiar with the ordinary meaning of controlled substance slang and jargon, and with the methods of packaging, consuming and transferring of controlled substances. I am also familiar with the manners and techniques of traffickers in cocaine, cocaine, heroin, marijuana, and fentanyl as practiced locally, including the importation from Mexico.

8. Based on my training, experience, and consultation with other law enforcement officers experienced in narcotics tracking organizations, I am also aware that drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are mobile and they have instant access to telephone calls, text, web, email and voice messages; tending to indicate efforts to import and distribute controlled substances within the United States and between the United States and Mexico; drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit; drug traffickers and their accomplices will use digital devices like cellular telephones, tablets, and laptop computers because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations; drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo; drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units as well as the operational status of checkpoints and border crossings; the use of digital devices like cellular telephones, tablets

4

and laptop computers by traffickers tends to generate evidence that is stored on the digital devices, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data; individuals involved in drug trafficking often utilize digital devices like cellular telephones, tablets, and laptop computers with photograph and video capabilities to take and send photographs and videos of other members of criminal organizations, firearms, drugs, criminal proceeds, and assets purchased with criminal proceeds; and individuals involved in drug trafficking may utilize laptop computers and cellular telephones to generate or save documents to track proceeds or inventory related to the movement of narcotics or drug proceeds and may visit websites to research or support false background stories in an attempt to create a front of a legitimate operation.

9. Based on my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular devices (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular device. Specifically, searches of cellular devices of individuals involved in the importation of narcotics may yield evidence:

    a.    tending to indicate efforts to deliver controlled substances from Mexico to the United States, or to sell or distribute controlled substances in the United States;

    b.    tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, phone numbers – that may contain electronic evidence regarding efforts to deliver controlled substances from Mexico to the United States to traffic, sell, or distribute controlled substances in the United States or to conduct money laundering activity;

    c.    tending to identify co-conspirators, criminal associates, or others involved in efforts to deliver controlled substance from Mexico to the United States or to traffic, sell, or distribute controlled substances in the United States;

    d.    tending to identify travel to or presence at locations involved in efforts to deliver controlled substance from Mexico to the United States, or to traffic, sell or distribute controlled substances in the United States;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

10. Since November of 2022, DEA agents from the San Ysidro District Office (SYDO) have been investigating a drug trafficking organization (DTO) based out of Tijuana, Mexico. In the course of this investigation, investigators identified HEREDIA, NAVARRETE, and others as members of this DTO.

11. On November 8, 2022, at approximately 9:48 a.m., investigators received an alert indicating that HEREDIA entered the United States through the San Ysidro, California Port of Entry. Records checks revealed that HEREDIA was the sole occupant of a white Lincoln MKX bearing Baja California, Mexico plates AHG-928-A. Agents and followed HEREDIA as she arrived at the Villagio Apartments located at 1760 E. Palomar Street, Chula Vista, California and immediately entered into the garage with "26" marking on the top. At approximately 11:32 a.m., surveillance team members observed a male who was later identified as Ramon VIGIL ("VIGIL") directing HEREDIA out of the garage and immediately closing it after HEREDIA left. Subsequent to her leaving, some investigators followed HEREDIA while others maintained visual surveillance of the Villagio Apartments. At approximately 1:15 p.m., investigators observed HEREDIA travel southbound on Interstate 805 and eventually returned to Mexico.

12. At approximately 12:49 p.m. the same day, surveillance members observed VIGIL exit apartment number "102" and enter a grey Dodge Ram bearing California plates 26435D3. VIGIL exited the apartment complex and drove to a nearby Exxon Gas station located at 2210 Otay Lakes Road, Chula Vista, California. Moments later, VIGIL began traveling southbound on Eastlake Parkway and stopped on the intersection of Eastlake

Parkway and Birch Road. Before the traffic light turned green, investigators observed VIGIL drive over the median and travel southbound in the northbound direction on Eastlake Pkwy. VIGIL eventually returned back to the Villagio Apartments. Agents on static surveillance at the Villagio Apartments observed a male subject who was later identified as Deandre JACKSON going in and out of the apartment #102 while carrying a small backpack.

13. On November 9, 2022, at approximately 3:30 p.m., investigators established surveillance at 1760 East Palomar Street, number 102, Chula Vista, California. At approximately 4:00 p.m., investigators observed a female later identified as Alexis LANDERUS Figueroa and a child enter the above location. At approximately 4:10 p.m., investigators observed VIGIL exit from the front door of unit 102 while carrying a weighted backpack. VIGIL then walked across to the Cottonwood Park located at 1771 East Palomar Street, Chula Vista, California, where his Dodge Ram was parked. Investigators observed VIGIL give the weighted backpack to an unknown male Hispanic individual and entered the driver seat, while the unknown male entered the front passenger seat. VIGIL departed and began to travel in a high rate of speed. Surveillance was terminated due to VIGIL's driving behavior.

14. Based on my training, experience, and knowledge of this investigation, I believe that VIGIL was performing counter-surveillance maneuvers on November 8 and 9, as described above, and that his and HEREDIA's observed activities on these days likely related to drug trafficking, including because of the August 3, 2023 seizure of cocaine from this organization and the other facts set forth below.

15. On April 7, 2023, at approximately 9:54 a.m., investigators received an alert indicating that HEREDIA entered the United States through the San Ysidro, California Port of Entry. Records checks revealed that HEREDIA was the sole occupant of a black Buick Envision bearing Baja California, Mexico plates AVU-052-A (the "Buick").

16. At approximately 10:00 a.m., investigators located HEREDIA in the parking lot of Vons located at 920 Dennery Road, San Diego, California. At approximately 11:08

7

a.m., I observed HEREDIA traveling northbound on Eastlake Pkwy until arriving at the TJ Maxx located at 878 Eastlake Parkway, Chula Vista, California. At approximately 11:51 a.m., investigators observed HEREDIA walk back towards the Buick and enter the front passenger side. Moments later, I observed the Buick backing out of the parking spot and headed towards the exit. I then observed the Buick being operated by a male driver, who was later identified as VIGIL. VIGIL continued eastbound on Eastlake Parkway until arriving on H Street. VIGIL then made a left turn and began traveling westbound on H St while quickly changing lanes of traffic for several minutes until arriving at the intersection of Otay Lakes Road and H Street. Surveillance members observed VIGIL make a right turn going northbound onto Otay Lakes Road before making a quick u-turn and head back southbound on Otay Lakes Road. VIGIL quickly position himself on the far-left turning lane to head back eastbound on H Street. At approximately 12:20 p.m., investigators observed VIGIL enter the Cabo Residence located at 2164 Cabo Bahia, Chula Vista, California and made a quick left before agents lost visual of VIGIL and the Buick. At approximately 12:46 p.m., agents observed VIGIL exit the Cabo Residence and walk towards a black Land Rover Defender bearing California plates 9DQX492 and enter the driver side of the vehicle. Agents subsequently terminated surveillance because VIGIL continued driving maneuvers that, based on my training, experience, and knowledge of this investigation, I believe were counter-surveillance maneuvers. I also believe that his and HEREDIA's activities on April 7, 2023 likely related to drug trafficking activities, based on my training, experience, and the facts set forth in this affidavit.

17. On July 19, 2023, the Honorable Michael S. Berg, U.S. Magistrate Judge, signed a tracking warrant (matter no. 23-MC-1287) authorizing the installation and monitoring of a Global Positioning Satellite (GPS) tracking device on the Buick, which was operated by HEREDIA.

18. On July 25, 2023, at approximately 12:48 p.m., agents installed a GPS tracker on the Buick and subsequently began receiving geo-location information. On the same date, agents followed the Buick, which was operated by a different person at that time,

Omar Alejandro LIZARREGA-Moreno ("LIZARREGA"), as he entered a garage of a residence at 2855 Cielo Circulo, unit 3, Chula Vista, California 91915 (the "Cielo Circulo residence).

19. On August 1, 2023, at approximately 1:18 p.m., investigators conducting surveillance observed HEREDIA, LIZARREGA, and NAVARRETE eating at the IHOP located at 2258 Otay Lakes Road, Chula Vista, California. Moments later, investigators observed NAVARRETE exit the IHOP and enter the Buick. Investigators maintained surveillance on NAVARRETE as he drove away and eventually entered the garage of the Cielo Circulo residence. On this same date, agents observed through video surveillance a gray BMW X1 bearing Baja California, Mexico plates AVN-426-A (the "BMW") operated by LIZARREGA, enter the garage number 3 at the Cielo Circulo residence.

20. On August 3, 2023, at approximately 11:00 a.m., investigators received an alert indicating that HEREDIA had entered the United States through the San Ysidro, California Port of Entry. Records checks revealed that HEREDIA was the sole occupant of the Buick at that crossing.

21. At approximately 11:58 a.m. the same day, investigators observed HEREDIA arrive at the Panera Bread located at 2015 Birch Road, Chula Vista, California. Shortly after, investigators observed HEREDIA exit her vehicle and walk toward the Panera Bread. An agent observed a gray Volkswagen Jetta bearing California plates 8ZSK783 (the "Jetta") belonging to NAVARRETE parked in the same parking lot. Minutes later, investigators observed NAVARRETE and HEREDIA exiting the Panera Bread and walk toward the Jetta. An agent saw NAVARRETE open the driver side door of the car, for HEREDIA to enter it. NAVARRETE then walked toward the Buick and entered its driver seat. Investigators then observed NAVARRETE as he exited the parking lot and traveled to the Cielo Circulo residence and entered the garage for apartment number 3. An agent observed HEREDIA operating the Jetta and driving to the Ross For Less department store located at 1650 Millenia Avenue, Chula Vista, California.

22. At approximately 2:15 p.m. the same day, I observed the Buick backing out of the garage number 3 and exit the residential complex.

23. At approximately 2:18 p.m. the same day, a San Diego Sheriff's Department Detective, Detective Jeremy Bedingfield, observed NAVARRETE driving the Buick, alone in the car, and commit a traffic violation by failing to stop before the line at a red light located at Gold Medal Way and Olympic Parkway in Chula Vista, California. During the stop, Detective Bedingfield asked NAVARRETE for consent to search his vehicle. NAVARRETE gave consent to search the vehicle. During this search, Detective Bedingfield located **Target Device 3** in the middle console of the Buick. NAVARRETE claimed ownership of **Target Device 3** during the stop. Detective Bedingfield then deployed his trained canine, "Milo," and received a positive alert to the rear bumper area of the Buick. In the course of a subsequent search of the vehicle, Detective Bedingfield located an empty aftermarket compartment in the dashboard of the vehicle. Based on my training, experience, knowledge of this investigation (including Milo's alert) and consultation with other law enforcement officers, I believe the compartment in the Buick has been used for the concealment and transportation of controlled substances.

24. At approximately 3:20 p.m. the same day, August 3, 2023, two Border Patrol Agents approached HEREDIA, who had been in the P.F. Chang's located on Birch Road in Chula Vista, California, after exiting the Ross For Less store noted above. At the time agents made contact with her, she was sitting in the driver's seat of the Jetta and alone in the vehicle. She was detained. One of the agents located **Target Device 5** on the front passenger seat. HEREDIA claimed not to own the device, but she stated that she knew the passcode for it. The agent also located **Target Device 4**, inside of HEREDIA's purse. HEREDIA claimed ownership of this device. The agent then located a large bundle of U.S. currency inside of HEREDIA's purse, totaling approximately $1,771. The agents then transported HEREDIA to the parking lot of the Chula Vista Elite Athlete Training Center, located at 2800 Olympic Parkway, in Chula Vista, California.

25. At approximately 5:44 p.m. the same day, the Honorable Joseph Brannigan, Judge of the San Diego County Superior Court, issued a search warrant which authorized agents to enter and search the Cielo Circulo residence for evidence relating to suspected narcotics violations.

26. At approximately 6:15 p.m., DEA agents executed this search warrant. During the search, an agent located two duffle bags and one basket containing 30 packages of suspected cocaine, with a total weight of approximately 39.8 kilograms (87.7 pounds), inside the rear cargo area of the BMW, which was parked in a parking space associated to the Cielo Circulo residence, the search of which was authorized under the search warrant. The agent also located a large bundle of U.S. currency in the first drawer of the master bedroom vanity, approximately $4,380. The agent located **Target Device 2** on the kitchen counter of the residence. NAVARRETE claimed ownership of the device. While on scene at the traffic stop, the agent had asked NAVARRETE if he had any other phones. NAVARRETE responded by saying, "I have another one that I use to call those people," which, based on my training, experience, and knowledge of the investigation, meant that this was the phone NAVARRETE used to conduct and facilitate drug-trafficking activities. The agent then asked where that phone was located, and NAVARRETE responded, "Downstairs." I believe NAVARRETE was referring to **Target Device 2** because it was located on the kitchen counter of the main, downstairs level of the residence. The agent also located **Target Device 1**, which was in the master bedroom next to the bed. NAVARRETE claimed ownership of this device, too, and stated that he uses that phone for his business.

27. Based upon my experience and training, my knowledge of the investigation, and my consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, drug traffickers often work in concert utilizing cellular/mobile telephones because they are mobile and provide instant access to calls, text messaging capabilities, web, and voice messages. Drug traffickers often use cellular/mobile telephones in order to provide

instructions and synchronize an exact drop off and/or pick up time between load drivers and stash house operators (or others) of their illegal cargo. I also believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, photos, and other digital information are stored in the **Target Devices**.

28. In light of the above facts and my training and experience, there is probable cause to believe that HEREDIA and NAVARRETE were using the **Target Devices** to communicate with each other and other co-conspirators to further the distribution and importation of illicit narcotics. In particular, based on my training, experience, and the facts set forth herein, I believe that HEREDIA and NAVARRETE were working together, that HEREDIA, with the Buick, may have imported cocaine discovered in the BMW, and that they were conspiring to further the distribution of these drugs within the United States. In addition, based on my training and experience, I am aware that individuals involved in drug trafficking and other illegal activities often attempt to distance themselves from sources of incriminating evidence, including cellular devices. As a result, despite that HEREDIA did not claim ownership of **Target Device 5** and that NAVARRETE claimed **Target Device 1** is used only for his business purposes, I believe that evidence of the crimes listed above is likely to exist on all **Target Devices**, including **Target Devices 1** and **5**. Accordingly, I request permission to search the **Target Devices** for evidence of the crimes discussed herein and as set forth in Attachments A-1 through A-5 and B-1 through B-5, beginning on **November 8, 2022, up to and including August 3, 2023**.

29. I believe there is probable cause to apply this date range to all **Target Devices**, not only the devices found in HEREDIA's possession (**Target Devices 4** and **5**), because, as discussed above, I believe NAVARRETE has been a member of the conspiracy and DTO, and he likely has been conducting drug-trafficking activities with HEREDIA and others for at least months prior to August 2023. Based on my training and experience, individuals involved in drug trafficking are often involved with an organization for weeks or months before engaging in specific trafficking activities, and that members of an organization must build relationships and trust, which takes time, before they are entrusted

12

with substantial amounts of drugs, which have a substantial value. Here, I believe that HEREDIA and NAVARRETE were involved in a conspiracy to distribute and/or import at least the cocaine seized on August 3, 2023; and given the large quantity, that cocaine was likely worth at least hundreds of thousands of dollars. Based on my training and experience, I believe individuals like HEREDIA and NAVARRETE would need to be involved in a DTO for a substantial period of time—likely at least months—before being entrusted to be involved with such substantial quantities of narcotics. Accordingly, I believe there is probable cause to search the **Target Devices** found in his possession (**1, 2, and 3**) since investigators observed HEREDIA's and VIGIL's activities on November 8, 2022, and to search all **Target Devices** beginning on **November 8, 2022, up to and including August 3, 2023**, as set forth in Attachments A-1 through A-5 and B-1 through B-5.

## METHODOLOGY

30.  It is not possible to determine, merely by knowing a cellular device's make, model, and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can be tablets, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular devices do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular device models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the

13

data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

31. Following the issuance of this warrant, I will collect the **Target Devices** and subject it to analysis. All forensic analysis of the data contained within the device and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

32. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

33. Law enforcement has not previously attempted to obtain the evidence sought by the requested warrants.

## CONCLUSION

34. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Devices** will yield evidence of HEREDIA's and NAVARRETE's violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963. Accordingly, I request that the Court issue warrants authorizing law enforcement to search the items described in Attachments A-1 through A-5, and seize the items listed in Attachments B-1 through B-5, using the above-described methodology.

//
//
//

14

I swear the foregoing is true and correct to the best of my knowledge, information, and belief.

*Miguel Garrido*
Special Agent Miguel Garrido
Drug Enforcement Administration

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 25th day of August, 2023.

*Allison H. Goddard*
Honorable Allison H. Goddard
United States Magistrate Judge